(18 App. Div. 599.)

## CYRENIUS v. MUTUAL LIFE INS. CO. OF NEW YORK.

(Supreme Court, Appellate Division, Fourth Department.    June 12, 1897.)

INSURANCE—PAYMENT OF PREMIUMS—WAIVER OF FORFEITURE.

The M. Ins. Co. issued a policy upon the life of C. for the benefit of his son G. The policy contained a provision that it should be forfeited if the premiums were not paid when due, and also a notice that agents were not authorized to alter contracts or waive forfeitures. The application was made through, and policy delivered by, one P., an agent of the company. In an action on the policy it appeared that after the payment of the first premium in cash, the agent, P., accepted, in part payment of the next two premiums, produce delivered to him, and a note of a third party; that he allowed the premiums to be paid by installments running over a considerable time after their maturity; and, when fully paid in this manner, delivered a receipt, bearing date of the maturity of the premium, and indorsed by him as district agent, which also bore a notice that agents were not authorized to waive forfeitures. It also appeared that the fourth premium was never fully paid in cash before the death of the insured, but that the agent had consented to its being paid after maturity, in installments, and by the acceptance of the produce from a third party. It did not appear that the company had ever been informed of the method of payment of the premiums, or of P.'s description of himself as district agent. *Held*, that it was not shown that the forfeiture had been waived, or that any custom existed to accept payment of premiums in a manner different from that provided by the policy.

Ward, J., dissenting.

Appeal from trial term.

Action by Frank H. Cyrenius against the Mutual Life Insurance Company of New York. From a judgment for plaintiff entered on a verdict, and from an order denying a motion for a new trial on the minutes of the court, defendant appeals.    Reversed.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Edward Lyman Short, for appellant.

D. P. Lester, for respondent.

GREEN, J.    Upon a written application, subscribed by Alvin Cyrenius and George A. Cyrenius, a policy was, on the 18th day of June, 1873, issued by defendant, whereby it insured Alvin Cyrenius in the sum of $3,000 for the term of his natural life, and for the benefit of his son, George A.    The policy was delivered to the latter, who was the owner and holder thereof, on the 6th day of June, 1877, when Alvin died.    Thereafter proofs of death were served upon the company.    It refused to pay the loss, on the ground that the premium which became due, by the terms of the policy, on the 18th day of June, 1876, was not paid, and that by reason of such failure the policy and all rights and benefits thereunder were forfeited.    This action was thereafter instituted by the plaintiff, who, by assignment bearing date June 10, 1889, had become the owner and holder of the policy and of all the rights and interest of the original beneficiary thereunder.    The amount of the premium was $198.87, and it was provided in the policy that the first premium should be paid at the time of issuing the policy, and a like amount annually thereafter on or before the 18th day of June.    The policy contained the usual provision that, if the premium

should not be paid on or before the days mentioned for the payment thereof, then, in every such case, the company should not be liable for the payment of the sum assured, or any part thereof, and that the policy should cease and determine.   The plaintiff proved that Morris Place, of Oswego, N. Y., received the application, delivered the policy, collected the premiums, and delivered the receipts therefor, and that across the face of each receipt so delivered by him to the beneficiary was the following: "Countersigned at Oswego, N. Y., by Morris Place, District Agent."   The first premium was paid in cash when the policy was delivered.   The next premium became due June 18, 1874.   The testimony of George A. Cyrenius as to this payment is as follows:

"Q. When and how did you pay the premium due June 18, 1874, and to whom?   A. I paid the premium to Mr. Place,—a part trade and a part cash. I paid a part trade and a part cash to Mr. Place; part before the maturity of fhe renewal.   Before this I paid a watch.   It was valued at seventy-five dollars.   I delivered it to him.   Q. When next?   A. After I paid him two or three payments cash.   Q. Two or three payments, amounting, including the watch and payments, to how much?   A. In the neighborhood of between one hundred and fifty and one hundred and sixty dollars.   Q. How did you pay the rest?   A. The rest was a dividend paid, between forty dollars and fifty dollars, to balance one hundred and ninety-eight dollars or thereabouts.   Q. And then what did he do to you?   Hand you the renewal receipt?   A. I took up the renewal, receipt after I had finished paying,—a spell after,—when I made the last payment.   I took up the receipt at that time or after.   I received it from Mr. Place."

This receipt was dated June 18, 1874.   The premium due June 18, 1875, was paid by the beneficiary to Mr. Place, and a receipt bearing the last-named date was given therefor.   According to the testimony of the beneficiary, the amount of this premium was paid to Place, the agent, by a note made by one Smith, for $75 or $100, a dividend of $50 or $60, and as to the balance the beneficiary testifies:   "Q. When the balance?   A. The balance was mercantile trade; accumulation of before, I think, from 1874."   The plaintiff claims to have paid the premium which became due June 18, 1876.   The testimony upon which the plaintiff bases this claim is that of George A. Cyrenius, the beneficiary, and Frederick A. Cyrenius, the plaintiff.   George A. Cyrenius testified:

"Q. In 1876 he presented you another renewal receipt?   A. Yes, sir.   Q. The same as the other two, in general form?   A. Some time before maturity.   Q. Did he show you a receipt the same as the others?   A. Yes, sir.   Q. That was for the premium of 1876?   A. Yes, sir.   Q. Before June 18th or after?   A. Before maturity; before this premium.   Q. How many days before June 18th? A. Might have been a week or ten days; a few days; from a week to ten days.   Q. Did you call at his office, or he see you?   A. Yes, sir; I called at his office.   Q. What did you do about that year's premium then and there,— what agreement did you make, if any?   State what was said.   A. I told him I hadn't the adequate means for the whole, and I told him I would be able to pay him fifty dollars then.   I did at that time.   For the balance I got an ex- tension.   Q. Tell us what you got, what he said, and what you said?   A. Well, very good.   I said that I would not be able to pay it at the time.   I would be able to pay him fifty dollars, and I would pay it after.   I wanted a couple of months.   Q. You would pay the balance after?   A. I would pay the balance.   I told him I would like a couple of months, and he told me to pay as soon as I could.   I think it was that,—a couple of months; yes, sir. Q. What did he say to that?   A. He said, 'All right;' to get around as speedily

as possible. That is the sum and substance of all he said. Q. What further was said at that time, and what payments did you make, if any? A. I paid him twenty-five dollars next (I think that was in the fore part of July); twenty-five dollars later, in August; twenty dollars more the latter part, or the first of September; not later than the first of September. I think they were both—the twenty-five and the twenty dollar payments—in August. I paid them at Morris Place's office. Fifty dollars was paid also at his office when I had the conversation. I never got that receipt which he had. Q. What did he state about that dividend at the last interview, when you paid him the partial payments, and upon each occasion? A. Forty-odd dollars. Q. What did he say about it? What did Mr. Place say it would be or was? A. With the dividend applied, it would leave somewhere in the neighborhood of one hundred and fifty dollars; one hundred and fifty-odd, I think. Q. How is that? A. The balance. Q. The balance that you had to pay? A. The balance that I would have to pay. Q. And you paid one hundred and twenty dollars? A. Less the dividend, left one hundred and fifty dollars odd. I paid one hundred and twenty dollars in cash. Q. Fifty dollars before, and the rest afterwards? A. Yes, sir." In answer to a question propounded by the court, he said he did not go to Place and ask him for the receipt for the premiums of 1876 in the fall of 1876. "Q. Why not? A. At that time I hadn't paid it all. I never took them up until they were fully paid. Q. Do you know whether he had any produce from the farm at that time? A. My brother attended to that."

His brother, Frederick H. Cyrenius, testified as follows:

"Q. State your transactions with Mr. Place in reference to the payment of premiums upon this policy, when you had your conversations with him, and the amount of truck. In the first place, you carried on what,—a farm? A. In 1876 I was interested in the milk business. I began in 1875. I began to furnish milk to Mr. Place's house. Q. You began to furnish milk for him when? A. The 20th day of October, 1875. Q. Before you give us these items, state your conversation with Mr. Place as to what they were to apply upon, and all the details of it. Shortly after I began to furnish him with milk, I asked him whether he would pay the bill, or whether it would apply on our premium of insurance; and he told me that it would not matter; that anything he could use in the way of country produce at his house he would accept as part payment. Subsequently I furnished him with milk and produce to the amount of $44.10. I commenced October 20, 1875. This was to apply on the 1876 premium. Q. And you furnished right along until when? A. The last account is October 30, 1876. Q. Perhaps you better go on, and give the items. A. Milk tickets, October 20th, 1875, I furnished, $2.00; November 18th, $3.00; December 11th, $3.00; January 1st, 1876, $2.00; January 17th, $3.00; February 23d, $3.00; March 18th, $3.00; April 29th, $1.00; May 6th, $3.00; and by cash I paid the Milk Association, to furnish him subsequently to my milk business myself. I paid for him $9.18; a bushel of turnips, fifty cents; fifty cabbages, at five cents, $2.50; twenty bushels of apples, $3.00; one barrel of cider, $2.50; honey, $1.80. That was the extent, I believe. Q. Did you give the dates of these last items? A. This bears date October 30th. Q. 1876? A. Yes, sir. Q. That constitutes the memorandum of the truck and milk and produce you furnished from the farm? A. Yes, sir. Q. Up to June, 1876, that bill amounts to how much? A. How much? $33.80. Q. These are the items of it as you have it there? A. Yes, sir. $33.80 prior to June 18th. Q. Did you have any conversation with Mr. Place, at his office in the city of Oswego, with reference to giving time for the premium, and, if so, what was it? A. I had no conversation with him about that time: only the agreement that this would apply. This was some months prior to this time. That is all the conversation I had with him. I could furnish what I could in that way, and it would be as acceptable as cash to him."

Upon this evidence the plaintiff rested his case, and thereupon the defendant moved to dismiss the complaint upon the following grounds:

"First. That the policy was forfeited by the nonpayment of the premium June 18, 1876. Second. That there was no proof of the waiver of the payment

of the premium of June 18, 1876, at the time when it was due, or of any part thereof.      Third. That there was no evidence that Place had any authority to waive payment when due, or to extend the time of payment for the premium. Fourth. That there was no evidence of a waiver of the forfeiture of the policy, and no evidence that Place had any authority to waive any forfeiture.      Fifth. That there was no evidence of any alteration of the contract of insurance, and no evidence that Place had any authority to alter the contract.      Sixth. That the evidence shows that Place had no authority to waive the payment of the premium in 1876, or to extend the time of payment of the premium, or to waive the forfeiture of the policy, or to alter the contract of insurance in any respect.      Seventh. That it did not appear from the evidence that the premium due June 18, 1876, was ever paid.      Eighth. There was no evidence that Place was a general agent of the company."

The motion was denied, and counsel for defendant duly excepted.

The premium for 1876 was not paid at maturity.      This the plaintiff concedes.      Still he claims that the forfeiture provided by the provisions of the policy in such a case was waived by Morris Place, and that he had full power and authority to accept a part of the premium, give time for the balance, continue the insurance, and thereby waive the forfeiture.      The evidence here is entirely wanting to warrant such a conclusion.      The plaintiff relies upon the fact that each receipt for premium bore across its face the signature of Morris Place, with the words "District Agent" attached; and that, therefore, it must be presumed that the power was conferred upon him by the company to transact its business within the district, and there was no limitation or restriction to his authority other than territorial.      There is nothing in the record showing that the company had any information or knowledge that Place ever used the word "district" upon the premium receipts, or in any other place or manner.      There was no provision requiring him to indorse the receipts.      The policy provided that, if the premiums should not be paid on or before the dates therein fixed for their payment, at the office of the company in New York, or to agents when they produced receipts signed by the president or secretary, then the company should not be liable under the policy, and the same would cease and determine.      At the bottom of this policy, beneath the signatures thereto, were these words: "Agents of the company are not authorized to make, alter, or discharge contracts or waive forfeitures."      Not only this, but the premium receipt of 1874 contained the same notice.      A similar notice was contained in the premium receipt for 1875, in these words: "No person except the president or secretary is authorized to make, alter, or discharge contracts or waive forfeitures, and no contract, alteration, discharge, or waiver is valid except it be in writing, and signed by the president or secretary."      The plaintiff was thus apprised, not only by the original policy, but also by every written instrument delivered to him by the company, through its agent at Oswego, that the latter's authority was limited and restricted; that he had no authority to make, alter, or discharge contracts, or waive forfeitures; that no person other than the president or secretary was so authorized, and that "no contract, alteration, discharge, or waiver is valid except it be in writing, and signed by the president or secretary."      Where a waiver or alteration is required to be in writing, it cannot be made by parol.      Baumgartel v. Insurance Co., 136 N. Y. 547, 32 N. E. 990; Warren v. Insurance Co.

(Sup.) 19 N. Y. Supp. 990. "It is elementary that a principal is only liable for acts done by his agent within the scope of the authority, actual or apparent, with which the principal has clothed him; that it rests entirely with the principal to determine the extent of the authority which he will give to his agent; also that every person dealing with an assumed agent is bound, at his peril, to ascertain the nature and extent of the agent's authority. In insurance cases courts frequently inaccurately classify agents as 'local' and 'general.' But the extent of the territory which is to be the field of his agency is no test of the extent of the agent's authority within that field. His field of operations may include the whole United States, and yet his powers be special and limited. On the other hand, his field of operations may be confined to a single county or city, and yet his authority within that field be unlimited." Ermontraut v. Insurance Co. (Minn.) 65 N. W. 635. Every safeguard was taken by the company to restrict and limit the authority of its agents, and prevent unauthorized acts by them. The beneficiary was notified at the time the contract was made, and again each year upon the delivery of the premium receipts, of the limitations upon the authority of its agent with whom the beneficiary dealt. It is difficult to conceive what further could have been done by the company in protecting itself or its customers from the unauthorized acts of its agents. The plaintiff, therefore, not only failed to show that Place had authority to bind this defendant by his acts, upon which plaintiff relies as a waiver of the forfeiture, but his testimony clearly shows that the plain intention of the company was to withhold from its agent any power or authority to alter the terms of the contract, or to waive a forfeiture thereof. Such intention was clearly and definitely expressed in the original contract, and reiterated in each of the receipts for premiums paid. Of these restrictions and safeguards the beneficiary is deemed to have had notice and knowledge. The plaintiff nowhere denied this presumption and knowledge, and with this provision so impressed upon him he had no right to believe that the agent could bind the company by acts in excess of his actual authority. The plaintiff, to establish the agency or authority of Place, proved that he received the application, delivered the policy, received the first premiums, delivered the renewal receipts, and received the dividend orders. This did not constitute him a general agent of the company authorized to waive conditions of the policy as to payment of premiums. Merserau v. Insurance Co., 66 N. Y. 274; How v. Insurance Co., 80 N. Y. 39. There is no evidence tending to show that the power of the agent had been enlarged, and his authority, thus defined, must be regarded as the measure of his power. There is, then, no evidence of actual authority in Place to alter the contract, or extend the time of payment of the premiums, or waive the forfeiture for nonpayment. Such acts were beyond the scope of his employment, and are unauthorized. Marvin v. Insurance Co., 85 N. Y. 278; Shank v. Insurance Co., 4 App. Div. 516, 40 N. Y. Supp. 14.

But the plaintiff earnestly contends that, even if the agreement of Place with the beneficiary was beyond the scope of the agent's authority as disclosed, the defendant has ratified such acts, and become

bound thereby. If the course of the dealing between the beneficiary and the agent of the company had been brought to the knowledge of the company, and it had acquiesced in the manner of such dealings, or had accepted the partial payments, or it had been shown that there had been a general custom established to extend the time of payment, and to receive in payment of premiums property other than money in fulfillment of the provisions for payment of cash, then the principle invoked by plaintiff, that under such circumstances the principal is bound by the acts of the agent, might be applicable to this case. The facts of this case prevent the application of that principle. There is no evidence showing that this defendant knew of the arrangement between its agent and the beneficiary, or that the agent received partial payments on the premium, and extended the time for the payment of the balance; nor does the evidence disclose that the company ever received any partial payments so made. On the contrary, it does appear that the receipts of the company in each instance bore the date of the maturity of the premium, and were for the full amount thereof. There is no evidence tending to show that it ever came to the knowledge of defendant that its agent was accepting anything other than cash in payment of the premium. The beneficiary is presumed to have known, at the time of making the application, that the agent had no authority to receive anything but cash in the payment of premiums. Printed upon the margin of the application was the following: "Notice. This company accepts cash only in payment of premiums. No policy is binding until the premium has been paid." The policy itself provides: "No policy is binding upon the company until payment of the premium in cash." The contract further provides for the payment of a certain specified amount annually, and there is nothing in the contract showing, or tending to show, that anything but cash would be received in fulfillment of those conditions. The language used in the contract is consistent only with a payment in cash. The plaintiff, however, alleges in his complaint that the premium due June 18, 1876, has been fully paid, and has given evidence which he claims sustains the allegation. It appears from such evidence, and is conceded by the plaintiff, that that premium has not been paid unless the value of the farm produce furnished by the brother of the beneficiary to defendant's agent be allowed as part payment of the premium. The farm products which were furnished Place were not furnished by the beneficiary, but by this plaintiff. The arrangement whereby their value was to be allowed in payment of the premium of 1876 was made, not by the beneficiary, but by this plaintiff, who was then a stranger to the contract, had no interest therein, and acquired no right or interest therein for more than 12 years thereafter. The record is barren of any evidence of knowledge in the company of this agreement, or of a like agreement with any one, or that it received the fruits thereof. It certainly cannot be presumed to have known or suspected that its agent was making an arrangement with a stranger to the company and to the contract itself, whereby farm products were to be received from him as payment for premiums. "The doctrine cannot be established that, because an agent is authorized to solicit insurance, forward applications for

policies, and collect premiums in money, or even accept notes for deferred payments of premiums, he is therefore authorized to accept other kinds of property. The acceptance of property in payment of indebtedness by agents authorized to collect is so much aside from the current of commercial affairs that one dealing with an agent, knowing him to be such, who makes payments to him in property, has the burden of showing that he was authorized to accept property in payment, or else that the principal ratified his act in so doing, or accepted the fruits of it." Assurance Soc. v. Cole (Tex. Civ. App.) 35 S. W. 720; Hoffman v. Insurance Co., 92 U. S. 161; Catoir v. Trust Co., 33 N. J. Law, 487. The plaintiff here has utterly failed to fulfill the requirements necessary to take this case out of the general rule laid down in Assurance Soc. v. Cole, supra. For the reasons herein stated, we are of the opinion that the complaint should have been dismissed at the close of the plaintiff's case, on the grounds stated on the motion in respect to the premium due June 18, 1876, and which are set forth in this opinion.

Judgment and order reversed, and new trial ordered, with costs to abide the event. All concur, except WARD, J., dissenting.